## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

ALESIA BROWN,          )
                              )
      Plaintiff,        )
                              )
      vs.            )     **Case number 4:09cv0274 DJS**
                              )                  **TCM**
MICHAEL J. ASTRUE,     )
Commissioner of Social Security,  )
                              )
      Defendant.     )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security ("Commissioner"), denying Alesia Brown's ("Plaintiff") applications for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. § 401-433, and supplemental security income benefits ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381-1383b, for the period between November 28, 2002, and November 11, 2004. Plaintiff has filed a brief in support of her complaint; the Commissioner has filed a brief in support of his answer. The case was referred to the undersigned United States Magistrate Judge for a review and recommended disposition pursuant to 28 U.S.C. § 636(b).

## Procedural History

Plaintiff applied for DIB and SSI in December 2002, alleging she was disabled as of November 28, 2002, a result of a cerebrovascular accident ("CVA") or stroke, pancreatitis,

hypertension, diabetes, and a blood clot in her right arm. (R.[1] at 58-60, 461-63.) Her applications were denied initially and after a hearing in September 2004 before Administrative Law Judge ("ALJ") James Carletti. (Id. at 30-34, 468, 471-82, 1657-68.)

Fifteen days later after the ALJ's adverse decision, on December 30, 2004, Plaintiff filed new DIB and SSI applications and a request that the Appeals Council review the denial of her 2002 applications. (Id. at 1672, 1685-88.) The new applications were granted with an onset date of November 11, 2004. (Id. at 2382.) Plaintiff's request for review was also granted. (Id. at 492-96, 1676-80.) Consequently, the Appeals Council vacated the ALJ's decision and remanded for a determination of whether Plaintiff was disabled from November 2002 to November 2004. (Id. at 494-96.) Specifically, the ALJ was to further consider Plaintiff's residual functional capacity, explaining his rationale and noting the supporting evidence, was to further evaluate her subjective complaints, explaining his rationale, and, if necessary, obtain supplemental evidence from a vocational expert. (Id. at 495.) Following a hearing in December 2006, a different ALJ, Jhane Pappenfus, found that Plaintiff was not disabled during the period in question. (Id. at 19-29.) Plaintiff again requested review. (Id. at 14.) The Appeals Council, after considering additional evidence, denied her request, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 10-12.)

---

[1]References to "R." are to the administrative record filed by the Commissioner with his answer.

**Testimony Before the ALJ**

Plaintiff, represented by counsel, and Michael P. Brethauer, a vocational expert ("VE"), testified at the September 2004 administrative hearing.

Plaintiff testified that she lives with her daughter, who currently was off at college. (Id. at 2423-24.)  She is left-handed.  (Id. at 2425.)  She has no hobbies, does not belong to any clubs or social groups, and does not attend church.  (Id. at 2431.)

She completed the twelfth grade and went to two trade schools to be a cook.  (Id. at 2420.)  In addition to working as a cook, Plaintiff worked as a nursing home manager, home health aide, and a dietary aide.  (Id.)  She resigned from employment on November 28, 2002, because the pay was too low. (Id.)  She has not looked for work since because her right side is numb, she can hardly walk or stand, and she is in and out of the hospital due to her pancreatitis and blood sugar levels.  (Id. at 2421.)  The pancreatitis causes stomach cramps. (Id. at 2425.)  Also, she had a stroke after she resigned her job; the stroke affects her right side.  (Id. at 2421.)  Her brother helps her and her sister loans her money.  (Id.)

Plaintiff has been seeing Dr. Alkhouri[2] once a month for two years.  (Id. at 2422.)  She takes various medications he prescribes; none have any side effects.  (Id.)  She had to stop seeing a doctor he referred her to, a Dr. Albert, because she does not have any insurance. (Id.) She saw Dr. Albert for her pancreatitis and blood sugar.  (Id. at 2423.)  The problems with her blood sugar caused her to gain weight.  (Id. at 2426.)  At one point, she weighed 142

---

[2]Alkhouri's last name, and that of other doctors of Plaintiff, are misspelled in the transcript of the hearing.  The Court will employ the correct spelling.

pounds.  (<u>Id.</u>)  Within the past month, she had lost weight and now weighs 128 pounds.  (<u>Id.</u>)

Plaintiff further testified that she stopped drinking alcohol and using cocaine in November 2002, after her stroke.  (<u>Id.</u> at 2423.)

Plaintiff does her own cooking and cleaning.  (<u>Id.</u> at 2424.)  When doing chores, she cannot stand for longer than fifteen minutes without having to rest for fifteen minutes.  (<u>Id.</u> at 2430.)  For instance, it takes her approximately ninety minutes to straighten up the living room; it used to take ten.  (<u>Id.</u> at 2431.)  Although she has a driver's license, she does not drive because of dizziness.  (<u>Id.</u> at 2424.)  She uses a walker when her right leg hurts.  (<u>Id.</u> at 2424-25.)  Her right arm is weak.  (<u>Id.</u> at 2425.)  She has been told there is nothing she can do to strengthen the arm.  (<u>Id.</u>)

Plaintiff is tired during the day and cannot sleep at night without medication.  (<u>Id.</u> at 2427-28.)  She currently is not taking the sleep medication because she has no insurance.  (<u>Id.</u> at 2428.)  During the day, she watches television and dozes on and off for a total of three to four hours.  (<u>Id.</u>)  As her doctor has recommended, she elevates her feet when she sits.  (<u>Id.</u>)

Plaintiff has a "real bad headache" three days out of seven.  (<u>Id.</u> at 2429.)  Three of the remaining four days she has a mild headache.  (<u>Id.</u>)  When she is having a bad headache, she cannot concentrate and has difficulty following a television program.  (<u>Id.</u>)  The headaches last three to four hours.  (<u>Id.</u>)  She takes pain medication for the headaches.  (<u>Id.</u>)  She has leg pain all day every day.  (<u>Id.</u> at 2431.)  If she does something like go to the grocery store, she has to use the walker when she returns home.  (<u>Id.</u>)

Mr. Brethauer first testified about the exertional requirements of Plaintiff's previous jobs. (Id. at 2434.) The job of cook had two different <u>Dictionary of Occupational Title</u>s ("DOT") codes, but both classified it as medium physical demand, as were the jobs of home health aide and food service worker. (Id.) The food service manager job was of light physical demand. (Id.) The jobs had transferrable skills to a job such as a food and beverage order clerk, of which there were approximately 1,000 in the Missouri economy and 40,000 in the national economy. (Id.) The ALJ then posed a hypothetical question to Mr. Brethauer. (Id. at 2435.) He asked him to assume a younger individual with a high school education; vocational training as a cook; prior work activity that is light to medium in exertional requirements and is unskilled to skilled; with difficulty concentrating, standing, and walking; and who dozed during the day. (Id.) Mr. Brethauer replied that such individual could not do her prior work activities or any other work activity that existed nationally or locally. (Id.)

Plaintiff, represented by different counsel, and a different VE, Jeffrey F. Magrowski, Ph.D., testified at the second hearing two years later. At the beginning of the hearing, the ALJ asked Plaintiff to limit her testimony to the period between November 28, 2002, and November 11, 2004.

Plaintiff testified that she had last had a drink of alcohol in November 2002. (Id. at 2385.) Asked about her report to her doctor that she last drank in August 2003, Plaintiff replied that that was wrong. (Id. at 2385-86.)

Plaintiff testified that during the two-year period at issue, she had been treated for stroke, pancreatitis, poor leg circulation, diabetes, a bleeding ulcer, and a blood clot. (Id. at

2386-87.)  Because of her stroke, she had to learn again how to walk.  (Id. at 2387.)  Physical

therapy had not helped.  (Id.)  Her pancreatitis would regularly flare up and she would have

to be hospitalized.  (Id. at 2389.)  After she stopped drinking, it was thought that the

pancreatitis was caused by the diabetes.  (Id.)  She also has high blood sugar levels and has

to take insulin twice a day.  (Id. at 2389-90.)  At one point, she went into a coma.  (Id. at

2390.)  If her blood sugar was too high, she would get dizzy and vomit.  (Id.)  She had been

told how to maintain a diabetic diet and did so between November 2002 and November 2004.

(Id. at 2391.)  The poor circulation in her legs prevented her from walking far.  (Id.)  Also,

during those two years, she had numbness in her legs at least once a day.  (Id.)  She had a

single episode of a blood clot and a bleeding ulcer.  (Id. at 2391, 2392.)  She was on

medication for her depression.  (Id. at 2393.)  She stopped seeing the psychiatrist, Dr. Hartnett

in December 2005.  (Id. at 2394.)  She thought she might have begun seeing him in December

2004.[3]  (Id.)  Plaintiff had never been hospitalized for a mental depression.  (Id. at 2396.)  She

had, however, been taking medication for it that had been prescribed by Dr. Alkhouri.  (Id.)

Asked to describe her daily routine, Plaintiff testified that she took medication first

thing in the morning.  (Id. at 2396-97.)  She then bathed and combed her hair.[4]  (Id. at 2397.)

During the relevant time period, this would take three to four times longer than it did before

---

[3]The ALJ noted that the medical records indicated Plaintiff hd first seen Dr. Hartnett in April
2004 and had last seen him in December 2004.  The ALJ also informed Plaintiff's counsel that he
should locate the records in the thousand pages of exhibits.

[4]Plaintiff's sister helped her with these grooming tasks for the first five months after her stroke.
(Id. at 2397.)

her stroke.  (Id. at 2397-98.)  Initially after her stroke, her sister prepared her meals and did her laundry and grocery shopping.  (Id. at 2398, 2399.)  After three to five months, Plaintiff did these tasks.  (Id.)  When Plaintiff did her own grocery shopping, she used a motorized cart, did not go as frequently as before, and did not buy large quantities of items.  (Id. at 2400.)

Plaintiff does not attend church.  (Id. at 2401.)  She does not have a computer or any hobbies.  (Id.)  One month earlier, she got a dog.  (Id.)  Her brother and sister help her with her finances.  (Id.)  Her exercise program consists of her walking from room to room.  (Id.) She cannot sit for longer than thirty minutes before having to get up and cannot stand for longer than thirty minutes.  (Id. at 2402.)  She cannot walk farther than half a block or longer than five to ten minutes.  (Id.)  The heaviest weight she can lift is five pounds.  (Id. at 2403.) She did not drive during the relevant time because her doctor was concerned she would get dizzy.  (Id.)

In reply to the VE's question whether she had attempted to work between November 2002 and November 2004, Plaintiff replied that she had not.  (Id. at 2405.)  Asked about the date of December 2001 when she had last worked, Plaintiff replied that she had stopped working at the hospital and drew unemployment.  (Id.)

The VE testified that Plaintiff's past work as a dietary aide was medium, unskilled as classified in the DOT and was light as Plaintiff performed it; as a cook it was medium, skilled and as a cook in a supervisory position, it was light, skilled; and as a home health aide, it was heavy to very heavy and semi-skilled.  (Id. at 2408-09.)  Plaintiff had transferable skills of

supervising, ordering, planning menus, food preparation, and at least average reasoning, arithmetic, and language skills.  (Id.)  Plaintiff would not be able to perform any of her past relevant work based on her testimony limiting her to unskilled work at a light exertional level. (Id. at 2410.)  If she was limited to sedentary unskilled work, she also could not perform any of her past relevant work.  (Id.)

Asked if there were any jobs at a light, unskilled level Plaintiff could perform, given her vocational profile, education, and limitations of light, unskilled work, the VE testified that she could perform the job of a fast food worker, of which there were approximately 20,000 in the state economy and one million in the national economy.  (Id. at 2410-11.)  There were also jobs in light housekeeping and cashiering that Plaintiff could perform.  (Id. at 2411.)

Asked about a hypothetical person limited to sedentary unskilled work and with Plaintiff's transferable skills, the VE replied that there was work such a person could do that existed in significant numbers in the state and national economy, including work as a food and beverage order clerk, a table worker, and surveillance system monitor.  (Id.)

Plaintiff's counsel then asked the VE to consider a hypothetical person with the limitations set forth in Dr. Hartnett's Mental Medical Source Statement ("MSS"), see pages 34 to 35, infra.  (Id. at 2412.)  The ALJ, however, did not permit a reference to the MSS, but did permit counsel to incorporate in his question the limitations found by Dr. Hartnett.  (Id. at 2412-13.)  The VE testified that there were no jobs that existed in substantial numbers in the national economy that a person with those limitations could perform.  (Id. at 2413.) Counsel started to ask the VE to consider a hypothetical person with the limitations set forth

in Dr. O'Brien's Physical MSS, see page 37, infra, but the ALJ refused to permit it on the grounds that Dr. O'Brien had not seen Plaintiff until after the time period in question. (Id.) The ALJ rejected counsel's argument that Dr. O'Brien's MSS addressed a level of functioning that Dr. O'Brien said existed during the relevant time period. (Id.) The ALJ stated that she and counsel were both limited to medical evidence from 2002 to 2004. (Id. at 2415.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to her applications, records from health care providers, and various assessments.

When applying for DIB and SSI, Plaintiff completed a Disability Report. (Id. at 77-86.) She listed her height as 4 feet 10.5 inches tall and her weight as 107 pounds. (Id. at 77.) Her impairments first bothered her on November 28, 2002, and prevented her from working that same day. (Id. at 78.) She stopped working as a cook in December 2001 when she was laid off. (Id. at 78-79.) This last job required that she walk, stand, stoop, and reach for six to eight hours each day; handle, grab, or grasp big objects for three to four hours; sit or climb for one to two hours; and kneel, crouch, and crawl for one hour. (Id. at 79.) The heaviest weight she frequently lifted was ten pounds; the heaviest weight she occasionally lifted was twenty pounds. (Id.) She completed high school in 1982. (Id. at 84.)

In a Pain Questionnaire, Plaintiff described a constant sharp, stabbing pain in her right arm and leg. (Id. at 100.) Moving around caused the pain, which she had had since November 17, 2002. (Id. at 100.) Nothing, including pain medication, helped. (Id.) The

medication does make her nauseous.  (Id.)  In a Claimant Questionnaire, Plaintiff reported that she had lost feeling on her right side from her head to her toes and could not walk without a walker.  (Id. at 101-04.)  She cannot drive, clean, cook, comb her hair, walk, bend, or wash clothes.  (Id. at 102.)  She cannot do any chores.  (Id. at 103.)  She cannot bend to put food in the oven or lift pots.  (Id. at 102.)  Pain makes it difficult for her to go to sleep or stay asleep.  (Id.)  She cannot shop because she cannot stand for long, even using a walker.  (Id.) She watches television and reads the newspaper.  (Id. at 103.)  She leaves her home three times a week to go to the doctor or go to therapy.  (Id.)  Someone drives her.  (Id.)

Two months later, Plaintiff completed another Claimant Questionnaire.  (Id. at 106-09.)  She listed six medications, none of which had any side effects.  (Id. at 106.)  She could bathe, with help, and comb her hair with her left hand.  (Id. at 107.)  She could not work, walk far, climb stairs, drive, or stand long without getting dizzy.  (Id.)  The meals she prepared were sandwiches, cereal, or microwaved dishes.  (Id.)  She could not lift pots and pans, stir, open a can, whip, or lift small objects.  (Id.)  Someone went with her when she shopped.  (Id.) She watched old movies, comedies, and police programs on television and read novels.  (Id. at 108.)  She left the house once every two weeks; someone drove her.  (Id.)  She lived with her teenage child, who needed little care.  (Id. at 109.)

A friend who had known Plaintiff for nine years reported in a Daily Activities Questionnaire that Plaintiff had trouble sleeping and using her right arm and leg.  (Id. at 105.) Noise bothers her.  (Id.)

Plaintiff listed seven jobs in a Work History Report.  (Id. at 92-99.)  She worked most often as a cook.  (Id. at 92.)  She also worked as a home health aide from April 1991 to October 1993 and as a hospital dietary aide from July 2001 to December 2001.  (Id.)  Plaintiff had reported earnings in 1980, 1982 to 1985, inclusive, and 1993 to 2002, inclusive.  (Id. at 72, 528-30.)  Her highest annual earnings were $14,123.20, in 2001.  (Id. at 72, 529-30.)  Her lowest earnings were $80, in 2002.  (Id.)

The relevant medical records before the ALJ are summarized below in chronological order,[5] beginning with those of Michael D. Impey, D.O.

Plaintiff consulted Dr. Impey on August 6, 2001, for her hypertension.  (Id. at 213.)  She was out of medication, and her blood pressure had increased.  (Id.)  Her medical history also included chronic pancreatitis and insulin-dependent diabetes.  (Id.)  She had had a cholecystectomy in 1987 and a gunshot wound to her abdomen in 1990.  (Id.)  She smoked two packs of cigarettes a day, and had done so for fifteen years, but did not drink alcohol.  (Id.)  Her blood pressure medication, Altace, was renewed.  (Id.)

Plaintiff was admitted to the St. Louis University Hospital on September 18 after experiencing nausea and vomiting for two days.  (Id. at 205-08.)  She reportedly had a history of hypertension, diabetes, and pancreatitis secondary to being a chronic alcohol drinker until approximately two years ago.  (Id. at 205.)  She also had a ten-year history of smoking.  (Id.)  She was given Demerol every two hours to relieve her abdominal pain.  (Id.)  Over the course

---

[5]References to medical records for conditions unrelated to her listed impairments, e.g., mammograms, a tubal ligation, or finger cuts, are omitted.

of her five-day hospitalization, her symptoms resolved and she was taken off pain medication. (Id. at 206, 207.) She was discharged on September 22. (Id.)

Three days later, Plaintiff returned to Dr. Impey's office for a follow-up of her pancreatitis. (Id. at 212.) She reported that she was doing better, but was afraid to eat much and was eating soup only. (Id.)

The next medical record is of Plaintiff's visit to Dr. Impey on May 10, 2002, for abdominal pain that was similar to that she felt when she had pancreatitis. (Id. at 211.) She did not want to go to the hospital. (Id.) Her prescriptions were renewed. (Id.)

Plaintiff was admitted to Des Peres Hospital on June 9 with complaints of abdominal pain, nausea, and vomiting for two days. (Id. at 273-77.) She reported that she had a history of pancreatitis for seventeen years. (Id. at 274.) After being treated for a few days on a clear liquid diet, Plaintiff improved and was discharged on June 12. (Id. at 274.) It was noted that her prevention of pancreatitis needed to center on stopping drinking. (Id. at 277.)

Plaintiff returned to St. Louis University Hospital on September 8 with reports of abdominal pain that had begun that morning. (Id. at 179-87, 189-204, 322-24.) At one point in the records it is reported that she denied any current alcohol or drug use, but smoked two packs of cigarettes a day and had done so for the past twenty-five years. (Id. at 204, 322.) At another point in the record, it is reported that she still occasionally drank alcohol, had a history of binge drinking, and smoked one pack of cigarettes a day and had done so for the past ten years. (Id. at 194.) She rated the abdominal pain as an eight on a ten-point scale. (Id. at 204, 322.) A neurological examination was unremarkable, as was a psychiatric

examination. (Id.) Computed tomography ("CT") scans of her abdomen and pelvis showed a cyst in the tail of her pancreas. (Id. at 179, 189-92, 195, 201-02, 204, 322-23.) The diagnosis was acute exacerbation of chronic pancreatitis. (Id. at 194.) After treatment with a pain medication and Prednisone, Plaintiff reported on September 12 only very mild abdominal pain. (Id. at 179-80.) On discharge, she had no restrictions on her activity. (Id. at 180, 195.)

Plaintiff saw Dr. Impey again on October 29, complaining of abdominal pain, nausea, and vomiting. (Id. at 210.) The pain went away if she stopped eating. (Id.) Her diagnoses were chronic pancreatitis, depression, and insulin-dependent diabetes mellitus. (Id.) A prescription for Zoloft, an anti-depressant, was increased in dosage to 100 milligrams. (Id.)

On November 19, Plaintiff went to the emergency room at St. Alexius Hospital ("St. Alexius") with complaints of abdominal pain and vomiting. (Id. at 216-40.) She was then admitted. (Id. at 216.) She reported that she had stopped drinking the previous summer and before then had drunk less than a six-pack during weekends and not at all on weekdays. (Id. at 216.) She smoked less than one-half pack of cigarettes a day. (Id.) She lived by herself. (Id.) A CT scan of her abdomen and pelvis confirmed pancreatitis and peripancreatic inflammation and arteriosclerosis. (Id. at 221-22, 224-29.)

On November 28, Plaintiff was again admitted to Des Peres Hospital. (Id. at 242-72, 278, 547-49, 1215-638, 1656.) It was noted that she was to be transferred there yesterday from St. Alexius but had gone home instead. (Id. at 1188, 1190.) She had epigastric pain that had begun ten days earlier and could tolerate only water and grapes. (Id. at 243.) The pain

was different than that she felt when diagnosed with pancreatitis three months earlier and was a ten on a ten-point scale.  (Id. at 243, 1190)  After experiencing the pain for five to six days, she began intermittently to feel dizzy and she had a headache.  (Id. at 249.)  The admitting diagnoses were uncontrolled diabetes mellitus, abdominal pain, urinary tract infection, leukocytosis, and recurrent chronic pancreatitis.  (Id. at 248.)  Her medical history included chronic pancreatitis, alcohol abuse, diabetes mellitus, hypertension, a gunshot wound to the abdomen, and cholecystitis (an inflamed gallbladder) with cholelithiasis and choledocholithiasis.  (Id. at 251.)  Her current medications included Zoloft, Norvasc (for high blood pressure), Viokase (for pancreatitis), and Protonix (for gastroesophageal disorders).  (Id. at 249.)  She was reported to have "a significant history of alcohol abuse."  (Id. at 251.)  "She admit[ted] to excessive alcohol intake and [said] that she [drank] . . . six to 10 beers every few days."  (Id. at 252.)  She lived with her fiancé and daughter.  (Id. at 258.)  She had a history of using cocaine.  (Id. at 1403.)  Right and left vertebral artery angiograms indicated the absence of right and left pica.[6]  (Id. at 547-49, 1320.)

On December 2, Plaintiff reported having a headache that was a ten on a ten-point scale.  (Id. at 1245.)  Her diabetes was described as uncontrolled.  (Id. at 1246.)  Her headache had not improved by the next day or the day after.  (Id. at 1248-49.)  She also had a tingling feeling in her right hand and fingers.  (Id. at 1248.)  Her abdominal pain was under control.  (Id. at 1251.)  By December 5, Plaintiff wanted to eat grapes and to walk.  (Id. at 1254.)  She

_____

[6]Several other tests were performed during the course of Plaintiff's hospitalization.  Their findings appear throughout the more than 400 pages of records, are summarized at page 1321 of the record, and are reflected in the diagnoses at discharge.

still had a severe headache.  (Id.)  The next day, the headache persisted and the abdominal

pain reoccurred.  (Id. at 1257.)  The latter had again decreased the next day; the headache had

not.  (Id.)  On December 8, the headache was at last better.  (Id. at 1262.)  The next day, it

was again a ten.  (Id. at 1263.)  Her headache and abdominal pain had reportedly increased

on December 11.  (Id. at 1270.)

A consulting psychiatrist saw Plaintiff on December 17.  (Id. at 1186-87, 1318.)  He

found her to be withdrawn and with a flat affect and depressed mood.  (Id. at 1187.)  Her

thinking process was "sluggish."  (Id.)  She did not have any suicidal or homicidal ideation.

(Id.)  He diagnosed her with depressive disorder, recurrent, and a Global Assessment of

Functioning[7] ("GAF") of 20.[8]  (Id.)  He restarted her on Zoloft, which had been discontinued

on admission.  (Id. at 1186, 1187.)

Also while hospitalized, a consulting physician examined Plaintiff.  (Id. at 251-53,

1274.)  The physician's diagnosis was chronic pancreatitis, "most likely related to alcohol

intake," current and acute upper gastrointestinal bleeding, anemia, cerebellar infarct,

hypokalemia, and fungemia and bacteremia.  (Id. at 252-53, 1318.)  Another consulting

physician described Plaintiff as looking "chronically ill."  (Id. at 255.)  An endoscopy revealed

---

[7]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text
Revision 2000), the Global Assessment of Functioning Scale is used to report 'the clinician's judgment
of the individual's overall level of functioning.'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir.
2003); accord **Juszczyk v. Astrue**, 542 F.3d 626, 628 n.2 (8th Cir. 2008).

[8]A GAF between 11 and 20 is indicative of "[s]ome danger of hurting self or others . . . OR
occasionally fails to maintain minimal personal hygiene . . . OR gross impairment in communication
. . . ." Diagnostic Manual at 34.

multiple duodenal erosions, one duodenal ulcer, gastritis, and a hiatal hernia. (Id. at 271-72, 1321.) Plaintiff's headache and abdominal pain were present but under control on December 13. (Id. at 1282, 1284.)

Several days before discharge, Plaintiff was transferred to a rehabilitation ward for physical and occupational therapy to work on her endurance, balance, and fine and gross motor coordination. (Id. at 259, 1318.) She was to use a wheeled walker at home. (Id. at 1238.) She was discharged on December 22 with diagnoses of chronic pancreatitis, cerebral artery occlusion with cerebral infarction, insulin dependent diabetes mellitus, urinary tract infection, hyponatremia,[9] gastric ulcer with a hemorrhage, duodenal ulcer with a hemorrhage, disseminated candidiasis (yeast infection), staphylococcal septicemia, alcohol abuse, iron deficiency anemia secondary to chronic blood loss, protein-calorie malnutrition, esophageal ulcer, and major depressive-effective disorder. (Id. at 260, 1240, 1317.)

Plaintiff first consulted Nabiel Alkhouri, M.D., with St. John's Neighborhood Health Center on January 6, 2003. (Id. at 284-87, 762-65.) She reported that she had recently been discharged from Des Peres Hospital after being diagnosed with a stroke. (Id. at 284, 762.) Her right side was numb. (Id.) Dr. Alkhouri referred her to physical and occupational therapy. (Id. at 287, 765.) Plaintiff participated in both. (Id. at 289-90.) The physical therapist reported that Plaintiff had attended eight outpatient physical therapy sessions and had improved her standing balance and was no longer walking with a decreased right heel

---

[9]Hyponatremia is "[a] decrease in the serum sodium concentration below the normal range . . . ." Merck Manual of Diagnosis and Therapy, 991 (16th ed. 1992).

strike and step length.  (Id. at 289.)  Her right lower extremity strength had improved.  (Id.)

The occupational therapist reported that Plaintiff had functional strength, range of motion, and

coordination in her right arm.  (Id. at 290.)  She continued to be limited by complaints of pain

that was an eight on a ten-point scale with throbbing and parathesia on her right side.  (Id.)

She had increased her participation in the activities of daily living, but noted that such

activities took longer than normal.  (Id.)  She wanted to be discharged from occupational

therapy after five lessons.  (Id.)  It was noted that she had met most of her goals, with the

exception of laundry activities, which were declined because her washing machine was

broken.  (Id.)

While participating in physical and occupational therapy, Plaintiff telephoned Dr.

Alkhouri on January 16 to report pain on the right side of her body and to request pain

medication.  (Id. at 282, 760.)  She was instructed to go to the emergency room if the pain was

severe.  (Id.)

On January 20, Plaintiff saw another doctor in Dr. Alkhouri's practice about throbbing

pain in her right leg and pain and numbness in her right arm.  (Id. at 282-83, 760-61.)  She

also had low back pain.  (Id. at 283, 761.)  On examination, the reflexes on her right were

diminished.  (Id.)  An x-ray of her lumbar spine revealed lumbar dextroscoliosis and

arteriosclerosis.  (Id. at 288.)  On Dr. Alkhouri's referral, Plaintiff saw Steven Grondalski,

O.D., the next day and was diagnosed with diabetic retinopathy.[10] (Id. at 292, 294-95.) Glaucoma was suspected. (Id. at 292.)

Plaintiff saw Dr. Alkhouri again on March 6 about the pain and numbness on her right side. (Id. at 280-81, 758-59.) On examination, she was in no apparent distress.[11] (Id. at 281, 759.) Plaintiff's various medications were renewed when she saw Dr. Alkhouri on April 3. (Id. at 389-90, 756-57.) After her May visit, she was diagnosed with peripheral neuropathy, insulin-dependent diabetes mellitus, intermittent abdominal pain, and insomnia. (Id. at 387-88, 754-55.) An x-ray taken the following week showed no evidence of a renal mass or obstruction; the pancreas appeared unremarkable; and the spleen was not enlarged. (Id. at 386.) It was noted that the gallbladder had been surgically removed. (Id.) Other than being status-post cholecystectomy, the abdominal x-ray was unremarkable. (Id.)

On May 21, Plaintiff saw a neurologist, Salvador Cruss-Flores, M.D. (Id. at 435-42.) She informed him that she had stopped drinking alcohol and using crack cocaine and marijuana four to five years ago. (Id. at 436.) She smoked one-half pack of cigarettes a day. (Id.) Dr. Cruss-Flores opined that Plaintiff possibly had had a cerebellar infarct and did have a history of gastrointestinal bleeding. (Id. at 439.) He could not understand her symptoms.

---

[10]Plaintiff was subsequently treated for diabetic maculopathy by Shamlal Tekwani, M.D., on January 21, May 6, June 10, July 15, August 19, October 2, and November 6, 2003; January 8, February 12, May 13, August 10, October 14, and November 14, 2004; February 17, June 23, and October 27, 2005; and June 22, 2006. (Id. at 767-95, 796-8001, 1146-47, 1698-1703, 1767-78, 1781-84, 1805.) Some records included a notation of "low patient reliability."

[11]The notation "NAD" consistently appears in Dr. Alkhouri's records of Plaintiff's office visits. This notation refers to either "no apparent distress" or "no acute distress."

(Id.) He was to obtain her medical records, schedule her for a workup, increase her dosage of amitriptyline (an anti-depressant), and have her return in two months. (Id.)

Plaintiff saw Dr. Alkhouri again in June, reporting that she had pain in her right flank. (Id. at 384-85, 752-3.) She further reported that she was feeling better after her neurologist increased her dosage of amitriptyline. (Id. at 384, 752.) Dr. Alkhouri opined that the pain was due more to muscle strain than to a urinary tract infection. (Id. at 385, 753.) Three weeks later, CT scans of her abdomen and pelvis showed, similar to previous scans, hepatic (the liver) enlargement and a "somewhat bulky" uterus. (Id. at 382-83.) A probable right ovarian cyst and aortic atherosclerosis was diagnosed. (Id. at 383.) A follow-up was recommended. (Id.)

At her July 3 visit to Dr. Alkhouri, Plaintiff's medications were unchanged. (Id. at 380-81, 750-51.) It was noted that she was to have an ultrasound and an upper endoscopy. (Id. at 380, 750.) Three weeks later, on July 31, Plaintiff again complained of pain and numbness on the right side of her body and of numbness in both hands. (Id. at 377-78, 748-49.) She had seen an ophthalmologist and had a follow-up appointment in August. (Id. at 377, 748.) She had seen a gastroenterologist and had not kept a follow-up appointment. (Id.) For the past three days, she felt she was not able to empty her bladder. (Id.) Her blood sugar level was high. (Id.) She was instructed to follow up with the gastroenterologist and her neurologist. (Id. at 378, 749.)

Three weeks later, Plaintiff did follow up with Dr. Cruss-Flores. (Id. at 433-34.) He did not yet have her records from Des Peres. (Id. at 433.) He reported that Plaintiff continued

to have bilateral leg pain and thought it possible that she also had neuropathy, although she lacked certain indicia of such. (Id.)

An ultrasound of Plaintiff's pelvis on August 11 revealed an enlarged uterus and benign-appearing ovarian cysts. (Id. at 376.) A Doppler ultrasound of her lower extremities revealed possible peripheral vascular disease. (Id. at 375, 460.) Her right ankle/brachial index was 0.77 and her left was 0.81. (Id. at 460.)

Dr. Cruss-Flores saw Plaintiff on September 3, noted her complaints of continuing pain in her arms, hands, and legs, found her neurological examination to be normal, opined that she possibly had painful neuropathy, and recommended that she have a nerve conduction study. (Id. at 431-32.) The next day Plaintiff told Dr. Alkhouri about Dr. Cruss-Flores' recommendation. (Id. at 373-74, 745-46.) CT scans revealed the enlarged uterus seen before, a new left ovarian cyst, focal pancreatitis, and no evidence of abdominal obstruction or perforation. (Id. at 368-72.) Plaintiff was admitted the same day to St. Alexius for abdominal pain. (Id. at 402-04.) It was reported that she "had a known history of chronic alcohol abuse." (Id. at 402.) She was discharged two days later after her pain was controlled. (Id.)

On September 14, Plaintiff was admitted to St. Alexius with complaints of abdominal pain that had begun the day before. (Id. at 359-67, 400-01.) After being conservatively treated, she was discharged the next day with a diagnosis of pancreatitis, diabetes, and controlled hypertension. (Id. at 359.) It is noted at one point in the records that she did not smoke and at another point that she smoked one-half pack of cigarettes a day. (Id. at 360, 362.) Four days later, she saw Dr. Alkhouri. (Id. at 357-58, 743-44.) She reported that her

abdominal pain was much better; she was not nauseous or vomiting.  (Id. at 357, 743.)  His diagnosis was chronic pancreatitis, insulin-dependent diabetes mellitus, depression, and stable hypertension.  (Id. at 358, 744.)

Plaintiff returned to Dr. Alkhouri in October 16, complaining of pain in her hands and legs.  (Id. at 355-56, 741-42.)  He noted that she had not had any nausea, vomiting, or abdominal pain since restarting a medication.[12]  (Id. at 355, 741.)  He described her diabetes as "not well controlled" and added a diagnosis of obesity – she then weighed 138 pounds – to her impairments.  (Id. at 356, 742.)  She was to follow up with her neurologist and was referred to a dietician and to physical therapy.  (Id.)  Dr. Alkhouri advised her to stop smoking, exercise, and diet.  (Id.)

Plaintiff called Dr. Alkhouri's office on November 7, reported that both hands were numb, and asked to be seen that day.  (Id. at 353-54, 739-40.)  She reported that she had gone to the emergency room the previous Thursday or Friday and had been told she had arthritis.[13]  (Id. at 353, 739.)  She had not gone to the neurologist.  (Id.)  She was reminded to follow up with the neurologist and was referred to a rheumatologist.  (Id. at 354, 740.)

Five days later, she was admitted to St. Alexius for treatment of abdominal pain that had begun the week before.  (Id. at 396-98.)  After being treated for six days with medication, she was discharged on November 18.  (Id. at 396, 1694.)

---

[12]The name of the medication is illegible.

[13]Discharge instructions from St. Alexius dated October 31, 2003, list diabetes with high blood sugar and osteoarthritis as Plaintiff's impairments.  (Id. at 1693.)

Plaintiff returned to Dr. Alkhouri on November 20. (Id. at 350-52, 735-37.) The six medications she had received when discharged from the hospital and the ten medications she had been prescribed by Dr. Alkhouri were listed. (Id. at 351, 736.) She did not have any nausea or vomiting, but did have abdominal pain and pain and numbness in both hands. (Id. at 352, 737.)

On December 4, Plaintiff had a nerve conduction study. (Id. at 444.) She was scheduled to have an electromyogram (EMG"), but could not tolerate it. (Id. at 445.) When Plaintiff saw Dr. Alkhouri the same day, he noted that Plaintiff was going to physical therapy twice a week and was scheduled to see the neurologist in a few weeks. (Id. at 348-49, 733-34.)

Plaintiff saw Dr. Cruss-Flores on December 22. (Id. at 429-30.) Plaintiff reported that she constantly had pain, which was usually in her joints. (Id. at 430.) The nerve conduction study had revealed very mild sensory neuropathy in both lower extremities, but no evidence of carpal tunnel syndrome, and a normal medial nerve conduction. (Id. at 429.) He diagnosed her with chronic pain syndrome. (Id.) He was uncertain of the cause of the pain and wondered if it was musculoskeletal in origin. (Id.) He prescribed Neurotin and Percocet, the latter to be taken as needed. (Id.)

The next day, Plaintiff saw a podiatrist, Amod Paranjpe, D.P.M., for manual debridement of thick fungal toenails. (Id. at 576.)

On January 9, 2004, Plaintiff saw Dr. Alkhouri. (Id. at 346-47, 731-32.) She had been nauseous for two to three days, had vomited five to six times, had a dry cough, and had

abdominal pain, which was better than before.  (Id. at 346, 731.)  She felt depressed, but did not have any suicidal thoughts.  (Id.)

Plaintiff had an x-ray and CT scan of her abdomen and pelvis on January 27, revealing hypoventilatory changes in her lower lung fields, some hepatic enlargement, an enlarged uterus, and no obvious pancreatitis.  (Id. at 343-45.)

Plaintiff saw Dr. Alkhouri again on February 3.  (Id. at 341-42, 729-30.)

Plaintiff was admitted to St. Louis University Hospital on March 7 with complaints of abdominal pain that had begun the day before and was similar to the pain she had experienced with previous episodes of pancreatitis.  (Id. at 319-21.)  She lived alone, smoked one-half cigarette packs a day, did not drink alcohol, and did not use intravenous drugs.  (Id. at 319.) A CT scan of her abdomen showed no obstruction, but did show the pseudocyst that was previously present.  (Id. at 320, 340.)  After her pain had been controlled with morphine and she was stable, she was discharged on March 10 with a diagnosis of chronic pancreatitis.  (Id. at 320.)

Nine days later, Plaintiff returned to Dr. Alkhouri's office, reporting that she had been feeling depressed since her discharge from the hospital.  (Id. at 338-39, 727-28.)  Her abdominal pain was better.  (Id. at 338, 727.)  Depression was added to her diagnoses.  (Id. at 339, 728.)  Oxycodone was added to her medications.  (Id. at 338, 727.)

Plaintiff saw a gastroenterologist on April 4.  (Id. at 427-28.)  The notes of that visit are illegible.

On April 13, she informed Dr. Alkhouri that her legs hurt from her hips down. (Id. at 336-37, 725-26.) She was going to see a psychiatrist in three days. (Id. at 336, 725.) Neither depression nor obesity were listed as impairments. (Id. at 337, 726.) Depression was again added as a diagnosis in May. (Id. at 335, 336, 725.)

Plaintiff first consulted a psychiatrist, Thomas Hartnett, M.D., on April 16, reporting that she had been depressed for the past two years and had been having crying spells for the past three years. (Id. at 707.) The depression was caused by pain, an increase in weight, and a lack of income. (Id.) She had been in the hospital four times that year for pancreatitis. She was alert and oriented to time, person, and place. (Id.)

The following week, Plaintiff told Dr. Hartnett that she was more depressed. (Id. at 706.) She could not walk or work because of her leg pain. (Id.) She reported that the Wellbutrin did not help. (Id.) Dr. Hartnett was going to coordinate her medications with Dr. Alkhouri. (Id.) Plaintiff also reported that her disability case was on the docket. (Id.)

Plaintiff saw Dr. Hartnett again on April 30. (Id. at 705.) Her brother was in jail; she had a warrant for her arrest for nonpayment of city taxes. (Id.) She was "stressed out." (Id.) She was prescribed Zoloft and was to return in one month. (Id.)

Plaintiff went to the Endocrinology, Diabetes, and Metabolism Clinic at St. Louis University Health Services Center in May. (Id. at 421-26, 1647-55.) The examining physician, Stewart Albert, M.D., listed her impairments as insulin-dependent diabetes mellitus, hyperlipidemia, and pancreatitis. (Id. at 424, 1655.) He asked to her test her blood

sugar and report back to him, undergo laboratory tests, and return in two weeks. (Id.) He informed Dr. Alkhouri of his requests. (Id. at 1653.)

Plaintiff returned to Dr. Albert on June 16 and again on July 8. (Id. at 1643-46.) Her diabetes was described as uncontrolled at the earlier visit. (Id. at 1646.)

Plaintiff saw Dr. Hartnett again on May 22. (Id. at 704.) She wanted a letter for disability and to switch from Zoloft to Wellbutrin. (Id.)

Plaintiff was admitted to St. Alexius on June 4 and discharged four days later for a dilation and curettage ("D&C") after having a spontaneous abortion. (Id. at 331-32, 393-95, 651-63, 1692.) When she saw Dr. Alkhouri the following week she informed him that she was depressed. (Id. at 329.) Her blood sugar levels were high. (Id.)

Plaintiff informed Dr. Hartnett on June 11 that she had had a miscarriage and was depressed, sad, and frustrated. (Id. at 703.) Her daughter was home from college for the summer but refused to help with the housework. (Id.)

Plaintiff returned to Dr. Paranjpe on June 15 to have her thick, incurvated toenails cut. (Id. at 576.) The same day, Plaintiff saw Dr. Alkhouri. (Id. at 720-21.) She told him she had been depressed and had seen a psychiatrist, Dr. Hartnett. (Id. at 720.)

Plaintiff saw Dr. Albert on June 16 and again on July 8. (Id. at 417-20.) Her diagnoses were unchanged. (Id. at 418, 420.) On July 20, Dr. Paranjpe treated a painful ingrown toenail of Plaintiff's. (Id. at 575.)

Plaintiff went to the emergency room at St. Alexius on July 27 with complaints of abdominal pain that had started the night before. (Id. at 627-43.) An x-ray revealed basilar

hypoventilation.  (Id. at 326, 456.)  Plaintiff was treated with medication and discharged within six hours.  (Id. at 630, 634-35.)

 When Dr. Alkhouri saw Plaintiff on August 6 he noted that she had seen a podiatrist and had had an ultrasound of her lower extremities.  (Id. at 457-59, 716-17.)  The Doppler ultrasound had shown right toe pressure of 14 mm of mercury and the left of 9 mm of mercury.  (Id. at 457.)  The physician who had conducted that ultrasound had recommended an angiography to determine the cause of Plaintiff's poor circulation.  (Id. at 457, 626.)  On August 10, Dr. Paranjpe prescribed Keflex, an antibiotic, for treatment of Plaintiff's infected right big toe.  (Id. at 575.)  The next week, Plaintiff informed Dr. Alkhouri that the podiatrist had given her a seven-day course of antibiotics, after which she had initially felt better but had then started to again hurt.  (Id. at 454-55, 714-15.)

Plaintiff again went to the emergency room at St. Alexius on August 17 with abdominal pain.  (Id. at 603-21.)  She was reported to be noncompliant with medications.  (Id. at 607.)  She reported that she had quit drinking a few months earlier.  (Id. at 605.)  A consulting physician diagnosed severe acidosis, renal failure.  (Id. at 606.)  She was admitted to the hospital but left on August 21 against medical advice.  (Id. at 604.)

Plaintiff was admitted to St. John's Mercy Medical Center on August 30 after being taken to the emergency room for her complaints of abdominal pain.  (Id. at 561-72.)  It was noted that she had been experiencing multiple bouts of pancreatitis for the past twenty years.  (Id. at 557.)  It was also noted that she smoked, but did not drink, and carried out her activities of daily living without using any assistive device.  (Id. at 558.)  A chest x-ray taken the same

day was unremarkable.  (Id. at 571-72.)  A CT scan with intravenous contrast of her abdomen and pelvis revealed acute pancreatitis with probable early pseudocyst formation; a small ill-defined hypodense area in the left hepatic lobe; and uterine fibroids.  (Id. at 569-70.)  Four days later, after the pain which had gone away after the first few days of hospitalization reappeared, a repeat CT scan of the same area done also revealed hepatic steatosis, small bilateral pleural effusions and mild bibasilar atelectasis or infilitrate; and a possible ovarian cyst.  (Id. at 552, 567-68.)  An ultra-sound of Plaintiff's liver showed it to be heterogeneously echogenic, consistent with focal fatty infiltration.  (Id. at 566.)  After Plaintiff had been able to tolerate a full diet for twenty-four hours, she was discharged.  (Id. at 552-53.)  The physician queried whether the unexplained reoccurrences of her pancreatitis were attributable to her drinking, not following her diet, or not taking her medication – all of which she denied. (Id.)  Discharge notes instruct Plaintiff to eat a low fat diabetic diet and drink no alcohol.  (Id. at 447-48.)

When Plaintiff saw Dr. Alkhouri five days later, she told him she was not sleeping at night and was nauseous, but not vomiting.  (Id. at 452-53, 712-13.)  She had intermittent abdominal pain, but was better than before.  (Id. at 452, 712.)

A few weeks later, on October 5, Plaintiff saw Dr. Alkhouri again for complaints of right leg pain.  (Id. at 710-11.)

Plaintiff saw the endocrinologist on October 7.[14]  (Id. at 674-75.)

---

[14]The notes of this visit and other visits to the endocrine clinic are generally illegible.

Plaintiff went to the St. Alexius emergency room on October 21 with complaints of right leg pain with numbness in her toes. (<u>Id.</u> at 586-602.) She was limping. (<u>Id.</u> at 593.) After being treated with various medications, Plaintiff was discharged within four hours with instructions that she had to follow up with her doctor and that her condition could not be further evaluated in the emergency room. (<u>Id.</u> at 588, 589, 591.)

Plaintiff consulted Gary J. Peterson, M.D., with SLUCare on October 26 for her right leg pain that started in the foot and radiated up. (<u>Id.</u> at 672-73.) It had started the previous Thanksgiving when she had a stroke and was not alleviated or aggravated by anything. (<u>Id.</u>) Additionally, her left leg hurt after she walked a short distance and was alleviated by rest. (<u>Id.</u> at 672.) Subsequent testing revealed moderate to severe arterial insufficiency bilaterally at Plaintiff's ankles with severe digital arterial insufficiency bilaterally by digital plethysmography. (<u>Id.</u> at 676-77.)

Dr. Alkhouri renewed Plaintiff's various prescriptions when he saw her on November 5. (<u>Id.</u> at 708-09.) On November 12, Plaintiff reported to Dr. Hartnett that she was upset with the lack of a decision on her disability case. (<u>Id.</u> at 703.)

Plaintiff consulted the endocrinologist again on December 9. (<u>Id.</u> at 666.)

Also in December, she saw Dr. Hartnett. (<u>Id.</u> at 702.) She reported that the medications were not working. (<u>Id.</u>) She was upset with him for always being late. (<u>Id.</u>) She did not appear or call to cancel her next appointment with him on December 29. (<u>Id.</u>) She had kept an appointment on December 17 with Dr. Alkhouri. (<u>Id.</u> at 700-01.) She told him

that she had gone twice to the emergency room in the past two weeks for a urinary tract infection.  (Id. at 700.)  She had lost the prescription.  (Id.)

On January 11, 2005, Plaintiff returned to the emergency room at St. Alexius for her abdominal pain.  (Id. at 578-85, 1704-61, 1912-18, 2032-33.)  She described the pain as intermittent and sharp.  (Id. at 580.)  It was aggravated by nothing and alleviated by nothing.  (Id.)  She was admitted for an evaluation and workup.  (Id. at 584, 1711.)  She was given morphine for the pain, and "constantly" requested to be given stronger pain medication.  (Id.)  The physician told her she did not need it; she agreed.  (Id.)  She was discharged the next day.  (Id.)

Plaintiff returned to Dr. Peterson on January 24.  (Id. at 668.)  She complained of leg pain when walking but not when resting.  (Id.)  She also had intermittent numbness in her lower extremities.  (Id.)  His assessment was claudication.[15]  (Id.)  She was to increase the dosage of Pletal, encouraged to quit smoking, and return in three to four months, at which time segmental ankle/brachial indexes would be obtained.  (Id.)

Plaintiff saw the endocrinologist on January 27.  (Id. at 1871.)  It was noted that she forgot her medicine.  (Id.)

Dr. Hartnett saw Plaintiff again on January 29.  (Id. at 696, 1697, 1765.)  He noted that she had begun taking Wellbutrin and Paxil on her own for her depression.  (Id.)  She had been denied disability.  (Id.)  The next month, on February 11, she reported feeling depressed; she

---

[15]Claudication, usually referred to as intermittent claudication, is "a deficient blood supply in exercising muscle" and is usually described as a "pain, ache, cramp or tired feeling that occurs on walking . . . ."  Merck, 578 (emphasis omitted).

had no money. (Id.) She reportedly did not like to take medication. (Id.) On February 24, she reported that her disability had been approved, but she felt depressed because it hurt to walk. (Id. at 694.) She had suicidal thoughts, but assured him that she would go to the emergency room if she felt suicidal. (Id.)

Plaintiff was seen at the St. Alexius emergency room on March 5 for complaints of eye drainage. (Id. at 1901-11.) With her glasses, she had 20/30 vision in her right eye and 20/40 vision in her left. (Id. at 1906.) She was diagnosed with conjunctivitis infections in both eyes, treated, and discharged with a prescription for eye drops. (Id.)

Plaintiff returned to the endocrinologist on April 26, on July 1, and again on August 4. (Id. at 1865-70.)

Complaining of abdominal pain, Plaintiff returned to the St. Alexius emergency room on May 15. (Id. at 1919-37.) The pain was aggravated by pressure, but alleviated by nothing. (Id. at 1925.) Plaintiff was intravenously given medication and discharged home within four hours. (Id. at 1928.)

On July 6, Plaintiff went to the St. Alexius emergency room because of high blood sugar. (Id. at 1938-61.) Also, she had a headache that was a nine on a ten-point scale. (Id. at 1946.) Her glucose levels were high. (Id. at 1943.) Plaintiff was given a shot of Toradol and was discharged in approximately three hours. (Id. at 1947.)

On August 5, she told Dr. Hartnett that she was depressed because she could not work as a cook.[16] (Id. at 693, 1763.) She denied suicidal ideation, and refused a CT scan. (Id.) She reported that the medications, Paxil and Wellbutrin, helped. (Id.) Her next appointment, for August 19, was rescheduled to September 2. (Id.)

On August 30, Plaintiff's results on blood tests for diabetes were good. (Id. at 1640.)

An enlarged fibroid uterus was shown on an ultrasound done on September 14. (Id. at 1877.)

Plaintiff was treated at the St. Alexius emergency room on September 25 for pain in her left ear. (Id. at 1961-69.) She had an ear infection. (Id. at 1965.)

Plaintiff saw the endocrinologist on November 3 for a routine visit. (Id. at 1863-64.) Tests done the next day were positive for a high level of glyco hemoglobin. (Id. at 1878-84)

Plaintiff was admitted to Forest Park Hospital for a hysterectomy on December 6. (Id. at 804-1135, 1806-40, 2034-2379.) She was to be discharged on December 9, but remained hospitalized until December 13 after having a seizure secondary to Demerol. (Id. at 808-09, 813, 878, 895, 934-35, 941, 1102, 1807-08, 1811, 1814, 1816.)

Plaintiff saw the endocrinologist on February 16, 2006, April 20, and July 20. (Id. at 1857-62.)

Complaining of abdominal pain for the past week that was currently a ten on a ten-point scale, Plaintiff went to the St. Alexius emergency room on May 15. (Id. at 1970-80.)

---

[16]Plaintiff also saw Dr. Hartnett on March 11. The notes of that visit are illegible. (See id. at 1764.)

She reported that she had not seen a physician recently. (<u>Id.</u> at 1974.) She did not use drugs or alcohol, but did smoke one-half pack of cigarettes a day. (<u>Id.</u>) She was treated with intravenously-given morphine and discharged within two hours. (<u>Id.</u> at 1974-75.)

Dr. Albert informed Plaintiff on June 6 that her blood tests for diabetes were good, as were the tests for her liver, kidney, and minerals. (<u>Id.</u> at 1639.) Her glyco hemoglobin was high. (<u>Id.</u> at 1804.)

Dr. Barbara O'Brien first saw Plaintiff on June 22 when Plaintiff transferred her care from Dr. Alkhouri. (<u>Id.</u> at 1174, 1872.) Dr. O'Brien listed her impairments as insulin dependent diabetes; pancreatitis, "likely secondary to diabetes"; claudication; hypertension; neuropathy; and history of stroke. (<u>Id.</u>) She was continued on her current medications. (<u>Id.</u>)

On July 17, Plaintiff went to the St. Alexius emergency room seeking relief from abdominal pain. (<u>Id.</u> at 1149-62, 1788-800, 2018-31.) She was stabilized and discharged within three hours with prescriptions for Reglan and Ultracet and instructions to follow up with Dr. O'Brien. (<u>Id.</u> at 1154-57.)

Also included in the administrative record were assessments and evaluations of Plaintiff done pursuant to her applications.

Dennis McGraw, D.O., completed a Physical Residual Functional Capacity Assessment ("PRFCA") of Plaintiff in April 2003. (<u>Id.</u> at 302-09.) The primary diagnosis was CVA, the secondary diagnosis was chronic pancreatitis, and other alleged impairments were hypertension, diabetes, and a blood clot in her right arm. (<u>Id.</u> at 302.) These impairments resulted in exertional limitations of Plaintiff being able to occasionally lift

- 32 -

twenty pounds; frequently lift ten pounds; and stand, walk, or sit about six hours in an eight-hour day.  (Id.)  Her ability to push or pull was unlimited.  (Id.)  She had no postural, visual, communicative, or environmental limitations.  (Id. at 304-06.)  She had manipulative limitations in the fine finger control of her right hand.  (Id. at 305.)

In February 2005, Wendy Maple, a state agency non-medical consultant, completed a PRFCA of Plaintiff specifically for the period from November 28, 2002, to November 10, 2004.  (Id. at 678-85.)  The primary diagnosis was peripheral vascular disease with claudication; the secondary diagnosis was pancreatitis. (Id. at 678.)  As in the earlier PRFCA, these impairments were found to result in exertional limitations of Plaintiff being able to occasionally lift twenty pounds; frequently lift ten pounds; and stand, walk, or sit about six hours in an eight-hour day.  (Id.)  Her ability to push or pull was unlimited.  (Id.)  She had no manipulative, visual, or communicative limitations.  (Id. at 681-82.)  She had various postural limitations and was to avoid exposure to hazards such as machinery and heights.  (Id. at 680, 682.) The consultant concluded that Plaintiff's main problem during the relevant time was her pancreatitis which was attributable to Plaintiff's drinking and which ceased, according to Plaintiff, when she did not drink.  (Id. at 678-79.)  The consultant also noted that Plaintiff's allegations that her legs start hurting when she tries to do household chores, that she cannot get out of her bathtub, and cannot walk to the bus stop were "partially consistent" with the medical records for the relevant time.  (Id. at 683.)

Plaintiff had a consultative examination in April 2003 by Llewellyn Sale, Jr., M.D. (Id. at 296-301.)  Her chief complaints were CVA, or stroke, with numbness on the right side;

pancreatitis; hypertension; and diabetes. (<u>Id.</u> at 296.) She denied having a blood clot in her right arm. (<u>Id.</u>) After summarizing her medical history, described by Dr. Sale as vague, he reported that she had weakness in her right upper and lower extremities and tingling, not numbness, in the right side of her body. (<u>Id.</u> at 296-97.) She had trouble when she walked farther than one-half block, had leg cramps when she walked, and had difficulty standing for longer than twenty minutes. (<u>Id.</u> at 297.) She smoked one-half pack of cigarettes a day for the past twenty years and had stopped drinking alcohol in November 2002. (<u>Id.</u>) She denied alcohol abuse or treatment, but admitted having used crack cocaine as recently as 2002. (<u>Id.</u>) On examination, her gait was normal; she could walk heel and toe and squat. (<u>Id.</u> at 298.) She did not use an assistive device. (<u>Id.</u>) Her fine finger control was normal on her left and impaired on the right. (<u>Id.</u>) She was left-handed. (<u>Id.</u>) Her muscle strength was reduced on the right side in her grip (3/5), in her arm (4/5), and in her lower extremity (3/5). (<u>Id.</u> at 298, 300.) It was normal on her left side (5/5). (<u>Id.</u> at 298.) Her problems seemed to be more subjective than objective. (<u>Id.</u>) She had a full range of motion and normal straight leg raising. (<u>Id.</u> at 301.) Her corrected vision was 20/25 in each eye. (<u>Id.</u> at 300.)

At Plaintiff's request, Dr. Alkhouri wrote on January 29, 2004, that she was under his care for multiple medical problems and needed to follow up with him on a regular basis and see the specialists to whom she had been referred. (<u>Id.</u> at 446.)

Dr. Hartnett completed a Mental MSS on behalf of Plaintiff on July 22, 2005, rating her limitations in various areas as mild, moderate, marked, or extreme. (<u>Id.</u> at 687-90, 1844-47.) She was markedly limited in her ability to cope with normal work stress, relate in social

situations, interact with the general public, complete a normal workday and workweek without interruptions from symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. (Id. at 687-88, 1844-45.) She was moderately limited in her ability to function independently, maintain reliability, understand and remember simple instructions, maintain regular attendance and be punctual, maintain attention and concentration for extended periods, and respond to changes in a work setting. (Id.) She was mildly limited in her ability to behave in an emotionally stable manner, make simple work-related decisions, and work in coordination with others. (Id.) She was not extremely limited in any of the seventeen activities, and had no limitation in the remaining three. (Id.) She did have four or more episodes of decompensation. (Id. at 689, 1846.) She also had a substantial loss of her ability to respond appropriately to supervision, co-workers, and usual work situations and of her ability to deal with changes in a routine work setting. (Id.) She did not, however, have a substantial loss of the ability to understand, remember, and carry out simple instructions or in the ability to make judgments that were commensurate with the functions of unskilled work. (Id.) Asked for his opinion of the date of onset, Dr. Hartnett answered, "November 2002." (Id.) The impairment that caused the limitations was recurrent major depression. (Id. at 690, 1847.) A question mark was written in the space for the most recent GAF assessment, the highest GAF in the previous year, and the lowest GAF in the previous year. (Id.)

Plaintiff had a consultative examination on August 3, 2006, scheduled by her attorney and done by John E. Emmons, D.O. (Id. at 1176-85, 1848-56.) The only assistive device she

used was a grocery cart to lean on when she went shopping.  (Id. at 1177, 1849.)  She had a history of occasional use of cocaine and marijuana, but had not used either for twenty years. (Id.)  She stopped drinking alcohol in December 2005, but never had a drinking problem. (Id.)  She reported that she was weak in both legs since her stroke, more so on the right than on the left, and had frequent problems with numbness in her feet, more so in the right than in the left, after standing for one to two hours.  (Id. at 1178, 1850.)  After examination, Dr. Emmons diagnosed Plaintiff with a stroke, insulin-dependent diabetes mellitus, hypertension, pancreatitis, gastroesophageal reflux disease, status pot peptic ulcer disease, hyperlipidemia, status post uterine fibroids, major depressive disorder, dysthymia, anxiety disorder, and insomnia.  (Id. at 1182, 1854.)  He opined that she could sit or stand for four hours in an eight-hour workday and walk for thirty minutes.  (Id. at 1183, 1855.)  She could continuously lift or carry one to two pounds, frequently lift or carry five pounds, frequently lift ten pounds, occasionally carry ten pounds, and occasionally lift twenty pounds.  (Id.)  She had no manipulative, visual, or communicative limitations.  (Id. at 1183-84, 1855-56.)  She was limited in her ability to balance.  (Id. at 1184, 1856.)  She could only occasionally stoop or tolerate exposure to odors, dust, and noise.  (Id.)  Her bilateral leg pain could be expected to produce pain.  (Id.)  The pain could last all day.  (Id.)  Muscle spasm, irritability, and grimaces were all reflections of that pain.  (Id.)  Plaintiff used a cane.  (Id. at 1185.)  Because of her fatigue and pain, Plaintiff would need to take more than three breaks during an eight-hour workday.  (Id.)  November 2002 was the date of onset.  (Id.)  He did not feel that she could work full time.  (Id.)

Also in August 2006, Dr. O'Brien completed a Physical MSS for Plaintiff. (<u>Id.</u> at 1170-73.[17]) She did not provide a current diagnosis for Plaintiff, but did opine that Plaintiff could sit for four hours in an eight-hour workday and stand or walk for fifteen minutes. (<u>Id.</u> at 1170.) She could frequently lift or carry five pounds and occasionally lift ten pounds. (<u>Id.</u> at 1171.) She had significant manipulative limitations in both hands and had communicative limitations. (<u>Id.</u>) She did not have any visual limitations. (<u>Id.</u>) She was also limited in her ability to balance. (<u>Id.</u> at 1172.) She could only occasionally reach above her head, stoop, or tolerate exposure to odors, dust, and noise. (<u>Id.</u>) Her intermittent claudication, see note 15, supra, could be expected to produce pain. (<u>Id.</u>) The pain could last all day. (<u>Id.</u>) Muscle atrophy, muscle spasm, a reduced range of motion, sensory and motor disruption, weight loss or gain, sleeplessness, irritability, and grimaces were all reflections of that pain. (<u>Id.</u>) Plaintiff did use an assistive device – a grocery cart she leaned on. (<u>Id.</u> at 1173.) Depending on the activity, Plaintiff would need to rest every five to thirty minutes because of her leg pain. (<u>Id.</u>) For date of onset, she wrote "November 2002" and opined that Plaintiff's limitations could be expected to last twelve continuous months from that date. (<u>Id.</u>) Dr. O'Brien further noted that Plaintiff had "gotten a little bit worse over the last four years. She has moderate impairment/dysfunction/inability to sustain gainful employment." (<u>Id.</u>)

## The ALJ's Decision

The ALJ first noted that there was no dispute that Plaintiff had not been engaged in substantial gainful activity during the period from November 28, 2002, to November 11, 2004

---

[17]The first three pages of the four-page report appear again in the record at pages 1841-43.

("the relevant period"); that she did have a severe combination of impairments; and that she did not meet or medically equally any of the Listings prior to November 11, 2004. (Id. at 23.) Thus, the issues involved Plaintiff's residual functional capacity ("RFC") during the relevant period and whether there was work she could perform with that RFC.

Assessing Plaintiff's credibility for purposes of determining her RFC, the ALJ noted the frequent observations of Plaintiff's treating sources that she was not in acute distress. (Id.) Addressing the question of Plaintiff's pancreatitis, the ALJ found that it resolved with treatment in the hospital, was thought to be related to alcohol consumption or non-compliance with diet and medication, and, regardless, was episodic and did not interfere with Plaintiff's ability to work for twelve continuous months. (Id. at 24.) Plaintiff's hypertension, hyperlipidemia, and diabetes mellitus could be controlled with compliance with treatment. (Id.) Her diabetic neuropathy was mild and not marked by any neurological deficits. (Id.) Plaintiff's depression was not very limiting. (Id.) Her primary care physician prescribed antidepressants, and she did not see a psychiatrist or other mental health specialist on a regular basis. (Id.) A November 2002 examination showed her to have a normal mental status. (Id.) A December 2002 description of her not doing well was when her antidepressants had been discontinued. (Id.) Her depression was characterized in a March 2004 examination as mild, and a September 2004 examination showed no anxiety or depression. (Id.) Therefore, during the relevant period, Plaintiff did not have a mental impairment that resulted in a more than mild restriction of daily living activities or in more than mild difficulties in maintaining social functioning, in concentration, persistence, or pace,

or in any episodes of decompensation of extended duration.  (Id.)  The opinion of Dr. Hartnett – "a psychiatrist who saw [Plaintiff] after the period in question" – on a checklist form that her date of onset was November 2002 did not outweigh the contemporaneous observations of Plaintiff's treating sources.  (Id. at 24-25.)  Also noteworthy was his failure to provide a high or low GAF for the previous year.  (Id. at 25.)

The ALJ further found that the neurological residuals from Plaintiff's cerebral artery occlusion with a cerebral infarction were minimal.  (Id.)  When Plaintiff was discharged from the hospital, she had functional strength, range of motion, and coordination.  (Id.)  Although the stroke had affected her right side, she is left-handed.  (Id.)  And, treating sources consistently noted a normal gait.  (Id.)  The complaints of pain in her lower extremities were thought by an examining neurologist to be musculoskeletal in origin; however, her musculoskeletal examinations were unremarkable.  (Id.)

The ALJ next noted that Plaintiff's symptoms of peripheral vascular disease might have prevented prolonged standing and walking prior to November 2004, but not the walking and standing required for sedentary work.  (Id.)

Concluding that the objective medical evidence did not support Plaintiff's allegations as to the intensity, persistence, or limitations of her impairments, the ALJ found her credibility was further weakened by her history of questionable compliance, her inconsistent accounts of alcohol abuse, her work history, and her vague and evasive testimony.  (Id. at 26.)  The ALJ noted that the ALJ who had presided over Plaintiff's first hearing "was also unimpressed with her demeanor as a witness . . . ."  (Id.)

The ALJ then concluded that Plaintiff could not engage in heavy, strenuous or complex work activities, but could sit for six hours in an eight-hour workday, occasionally stand and walk up to two hours, lift and carry up to ten pounds, and perform unskilled work tasks during the relevant period.  (Id.)  As a result of her depression, she was limited to unskilled work activities.  (Id. at 27.)  This RFC prevented Plaintiff from performing her past relevant work, but did not prevent her from performing the full range of sedentary work.  (Id.)  She was not, therefore, disabled during the relevant period as defined in the Act.  (Id. at 27, 29.)

### Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A).  The impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002).  "Each step in the disability determination entails a separate analysis and legal standard."  **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006).  First, the claimant cannot be presently engaged in "substantial gainful activity."

See 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must have a severe impairment. See 20 C.F.R. §§ 404.1520(c), 416.920(c). The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d), and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description

of [her] limitations.'" **Moore**, 572 F.3d at 523 (quoting <u>Lacroix</u>, 465 F.3d at 887). "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record.  '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting <u>Frankl v. Shalala</u>, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2001).  This evaluation requires that the ALJ consider "(1) a claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions." **Wagner**, 499 F.3d at 851 (citing <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984)).  "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting <u>Pearsall</u>, 274 F.3d at 1218).  After considering the <u>Polaski</u> factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e).

The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. §§ 404.1520(f), 416.920(f). The Commissioner may meet his burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, or "[i]f [a claimant's] impairments are exertional (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the medical-vocational guidelines or 'grids,' which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment," **Holley v. Massanari**, 253 F.3d 1088, 1093 (8th Cir. 2001). "However, when a claimant is limited by a nonexertional impairment, such as pain or mental incapacity, the Commissioner may not rely on the Guidelines and must instead present testimony from a vocational expert to support a determination of no disability." **Id.**; accord **Baker v. Barnhart**, 457 F.3d 882, 894-95 (8th

Cir. 2006). <u>See</u> <u>also</u> **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005) (noting that the Guidelines may be employed if the nonexertional impairment does not diminish or significantly limit the claimant's RFC); Social Security Ruling 83-47C, 1983 W.L. 31276, *3 (S.S.A. 1983) ("[I]f the nonexertional limitation restricts a claimant's performance of a full range of work at the appropriate [RFC] level, nonexertional limitations must be taken into account and a nonguideline determination made.").

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting <u>Finch v. Astrue</u>, 547 F.3d 933, 935 (8th Cir. 2008)); <u>accord</u> **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion.'" **Wiese**, 552 F.3d at 730 (quoting <u>Eichelberger v. Barnhart</u>, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Id.**; **Finch**, 547 F.3d at 935; **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999). The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. Thus, if "it is possible to draw two

inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 224 F.3d 891, 894-95 (8th Cir. 2000).  See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

## Discussion

Plaintiff argues that the ALJ (a) erred by failing to consider retrospective medical evidence that related to the relevant period; (b) improperly weighed the Mental MSS of Dr. Hartnett; (c) failed to complete a function-by-function assessment of her RFC and to discuss the rationale for her RFC findings; (d) failed to include Plaintiff's nonexertional limitations in the hypothetical question asked the VE; and (e) failed to properly evaluate evidence of Plaintiff's peripheral arterial disease when determining whether she satisfied Listing 4.12.[18] The Commissioner argues, in relevant part, that if the ALJ erred in any respect, the proper response is remand.

The Court finds, for the reasons set forth below, that a remand is necessary.

A remand is required for a reexamination of the presence and extent of Plaintiff's depression during the relevant period.  When admitted to the hospital in November 2002,

_____

[18]Listing 4.12 is peripheral arterial disease causing intermittent claudication and, inter alia, a resting ankle/brachial systolic blood pressure ratio of less than 0.50 or a resting toe systolic pressure of less than 30 mm Hg.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.12(A), (C).  "The [ankle/brachial index] range that is generally considered normal is .95 to 1.2"  Vascular Disease Foundation , ABI, http://www.vasculardiseasefoundation.org/diseaseinfo/pad/anklebrachial.php (last visited Feb. 17, 2010).  Doppler ultrasound is an approved method for reading such pressure.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.00G(8).

Plaintiff was already taking an anti-depressant.  She was diagnosed by a consulting psychiatrist with a recurrent depressive disorder and a GAF of 20.  She was again diagnosed with depression by her treating physician in March and April 2004.  She reported to Dr. Hartnett when she first saw him in April 2004 that she had been depressed for two years.  The record includes reports of six visits to Dr. Hartnett during the period in question; however, the ALJ did not consider any of these under the mistaken belief that they were all after November 2004.  Although the ALJ discounted Dr. Hartnett's Mental MSS on the grounds that, inter alia, he did not list a current or previous GAF, she did not discuss the GAF of 20 that was assessed by a psychiatrist who saw Plaintiff in December 2002.

"Retrospective medical diagnoses constitute relevant evidence of pre-expiration disability."  **Jones v. Chater**, 65 F.3d 102, 104 (8th Cir. 1995); accord **List v. Apfel**, 169 F.3d 1148, 1149 (8th Cir. 1999).  See also **Parsons v. Heckler**, 739 F.2d 1334, 1340 (8th Cir. 1984) (holding that retrospective medical, psychological, or psychiatric evaluations are not automatically irrelevant because of the timing; rather, they must be considered to get a clear understanding of the claimant's condition).  "'Where the impairment onset date is critical, however, retrospective medical opinions alone will usually not suffice unless the claimed onset date is corroborated . . . .'"  **List**, 169 F.3d at 1149 (quoting Jones, 65 F.3d at 104).  The ALJ discounted Dr. Hartnett's opinion on the erroneous grounds that he had not treated Plaintiff during the relevant period.  He had.  She noted that Plaintiff was consistently described as being in no acute distress, see note 11, supra, but did not remark on the same treating physician consistently prescribing her anti-depressants.  She found fault with Dr.

Hartnett not opining as to Plaintiff's GAF during the relevant time, but did not discuss, or note, the contemporaneous GAF of 20. Because such was not mentioned, it can be assumed that the ALJ did not consider it. See **Jones**, 65 F.3d at 103.

Thus, the case should be remanded for an evaluation of Dr. Hartnett's opinion in the context of him having treated Plaintiff during the relevant time and of its relevancy to the question of the affect of Plaintiff's depression on her functioning. The ALJ should also consider other evidence that, although dated after November 2004, might corroborate the existence and extent of her impairments between November 2002 and November 2004 and, if necessary use a medical advisor to help resolve the onset date question. See **Grebenick v. Chater**, 121 F.3d 1193, 1200-01 (8th Cir. 1997) (endorsing use of medical advisor to determine onset date when medical evidence is ambiguous and retroactive inference is necessary).

The Appeals Council remand order directed the ALJ to further consider Plaintiff's RFC and to explain the rationale for the ALJ's RFC conclusions. Plaintiff argues that the ALJ did not do so.

"The RFC 'is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities,' despite his or her physical or mental limitation." **Roberson v. Astrue**, 481 F.3d 1020, 1023 (8th Cir. 2007) (quoting S.S.R. 96-8p, 1996 WL 374184, at *3 (Soc. Sec. Admin. July 2, 1996)); accord **Masterson v. Barnhart**, 363 F.3d 731, 737 (8th Cir. 2004); **Depover v. Barnhart**, 349 F.3d 563, 567 (8th Cir. 2003). "When determining a claimant's RFC, the ALJ must consider all relevant evidence, including

the claimant's own description of his or her limitations, as well as medical records, and observations of treating physicians and others." **Roberson**, 481 F.3d at 1023. The ALJ did consider Plaintiff's description of her limitations, evaluated the description, and found such not to be credible for the reasons outlined in <u>Polaski</u>, 739 F.2d at 1321, including inconsistencies in her testimony and her reports to doctors, for instance, ever-changing reports of when she stopped drinking alcohol; her poor work history, see **Juszczyk**, 524 F.3d at 632; and her demeanor, see **Johnson v. Apfel**, 240 F.3d 1145, 1147-48 (8th Cir. 2001).

The ALJ set forth Plaintiff's RFC as to her abilities to lift and carry, stand, sit, walk, and perform unskilled tasks. The ALJ did not, as noted by Plaintiff, address her abilities to push, pull, reach, or handle small or big objects. As noted by the Commissioner, under **Depover**, 349 F.3d at 567, an ALJ does not fail in his or her duty to assess a claimant's RFC on a function-by-function basis merely because the ALJ does not address all areas regardless of whether a limitation is found. Instead, an ALJ who specifically addresses the areas in which he found a limitation and is silent as to those areas in which no limitation is found is believed to have implicitly found no limitation in the latter. **Id.** at 567-68. In the instant case, however, there is a question which should be addressed on remand as to whether Plaintiff's numbness on her right side, including her hands, has affected her RFC to push, pull, reach, and handle. Although the ALJ found that the stroke had affected her right side and she was left-handed,

the ALJ did not address whether the stroke and peripheral neuropathy limited Plaintiff's abilities to push, pull, reach, and handle and, if so, whether those limitations affected her

ability to perform the full range of sedentary, unskilled work.  The Court notes that some of the jobs identified by the VE as ones which a person with the RFC outlined by the ALJ could perform require significant handling and reaching, e.g., order clerk, see <u>DOT</u> 209.567-014, 1991 WL 671794 (4th ed. 1991), and table worker, see <u>DOT</u>, 739.687-182, 1991WL 680217. Thus, unlike **<u>Depover</u>**, the ALJ's silence on Plaintiff's RFC to push, pull, reach, and handle might be a consequence of not assessing the affect of her stroke and peripheral neuropathy on those abilities and not an implicit conclusion that there is no affect.  Therefore, the case should be remanded for a further evaluation of Plaintiff's RFC in those areas which affect her ability to do work-related activities on a regular and continuing basis.  See **<u>Bladow v. Apfel</u>**, 205 F.3d 356, 359 (8th Cir. 2000).  "'A *regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule*.'" **<u>Id.</u>** (quoting SSR 96-8p, 1996 WL 374184, at *1).

Plaintiff also challenges the ALJ's failure to find that she did not satisfy Listing 4.12 during the relevant period.  The Commissioner notes that the ALJ found that Plaintiff did not satisfy any Listing during the relevant period, implicitly including Listing 4.12.  The Commissioner further notes that an August 2003 Doppler ultrasound revealed a right ankle/brachial index below that required for the Listing, see note 18, supra.  The Commissioner does not dispute that the findings of the Doppler ultrasound performed a year later are within the Listing.  The ALJ did not resolve the discrepancy or address the question of whether the latter ultrasound indicated a deterioration of Plaintiff's condition that would bring her within the reach of Listing 4.12.

## <u>Conclusion</u>

"[I]naccuracies, incomplete analyses, and unresolved conflicts of evidence can serve as a basis for remand." **Draper v. Barnhart**, 425 F.3d 1127, 1130 (8th Cir. 2005). For the reasons set forth above, a remand is appropriate in the instant case. Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be REVERSED and that this case be REMANDED for further proceedings as set forth above.

The parties are advised that they have **fourteen days** in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact. See **Griffini v. Mitchell**, 31 F.3d 690, 692 (8th Cir. 1994).

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  17th  day of February, 2010.